735 P.2d 963

**CONSOLIDATED FREIGHTWAYS CORPORATION OF DELAWARE,**
Plaintiff-Appellant,

v.

**STATE of Idaho, DEPARTMENT OF REVENUE AND TAXATION,**
Defendant-Respondent.

No. 16198.

Supreme Court of Idaho.

Feb. 19, 1987.

Rehearing Denied April 16, 1987.

Jeffrey A. Strother, Boise, for plaintiff-appellant.

Jim Jones, Atty. Gen., Theodore V. Spangler (argued), Deputy Atty. Gen., for defendant-respondent.

HUNTLEY, Justice.

Consolidated Freightways Corporation (Consolidated) is a Delaware corporation which performs intrastate and interstate transportation services within the continental United States and Alaska. Consolidated operates a Boise rate center which computes charges for the transportation services that it performs, both on its own and in conjunction with other common carriers with which it interlines its customers' shipments. These charges for transportation and related services are found in tariff schedules which are required to be filed with various regulatory agencies. In order to conduct its business, Consolidated acquires tariff schedules from various companies throughout the country. These schedules are mass-produced by tariff bureaus which specialize in compiling and preparing tariff schedules. In addition, compiled tariff schedules are provided to carriers who subscribe to the service. The printed tariff schedules are published in bound and looseleaf form, and they may be updated daily. The information acquired from the tariff schedules is entered into computers. Consolidated also acquires computer tapes which contain rate information.

Consolidated received periodic billings from the tariff bureaus. Upon paying the itemized amounts due, Consolidated charged the payment to two different Consolidated expense accounts. A portion of the amount paid was charged to account number 4627–10, entitled Tariffs and Schedules, which was intended to include charges made for the publications and supplements. A larger portion of the billing was charged to account number 4627–20, which was an account to which payments were charged for services that were in addition to providing the rate and tariff schedules. This later account included such charges as participation, dues and monthly general services provided by the tariff bureaus. These monthly services include rate sampling, costing, and revenue analysis services to be used in justifying general rate increases and restructures before the ICC.

The tax commission held the charges made to account number 4627–10 subject to use tax, because the account reflected the amount paid for printed publications shipped to and used in the Boise rate cen-

ter. The amounts charged to account number 4627–20 were treated as excluded from tax, because the charges were for services that were distinct and separate from providing the tariff schedules.

The first question we address is whether the use tax under I.C. § 63–3621 is applicable to Consolidated's acquisition of the tariff rate schedules. The use tax statute provides:

> **63–3621. Imposition and rate of the use tax.**—An excise tax is hereby imposed on the storage, use, or other consumption in this state of tangible personal property acquired on or after July 1, 1965, for storage, use, or other consumption in this state at the rate of four per cent (4%) of the value of the property, and a recent sales price shall be presumptive evidence of the value of the property.

"Storage" and "use" are defined in I.C. § 63–3615(a) and (b):

> **63–3615. Storage—Use.**—(a) The term "storage" includes any keeping or retention in this state for any purpose except sale in the regular course of business or subsequent use solely outside this state of tangible personal property purchased from a retailer.
>
> (b) The term "use" includes the exercise of any right or power over tangible personal property incident to the ownership or the leasing of that property or the exercise of any right or power over tangible personal property by any person in the performance of a contract, or to fulfill contract or subcontract obligations, whether the title of such property be in the subcontractor, contractor, contractee, subcontractee, or any other person, or whether the titleholder of such property would be subject to the sales or use tax, unless such property would be exempt to the titleholder under section 63–3622(d), Idaho Code, except that the term "use" does not include the sale of that property in the regular course of business.

In interpreting the language of a use tax statute, the court should use legislative intent as a primary guide. *Morrison-*

*Knudson Company, Inc. v. State Board of Equalization,* 58 Wyo. 500, 135 P.2d 927, 931 (1943). Further, legislative intent is evident by the language of the statute. *General Trading Co. v. State Tax Com.,* 322 U.S. 335, 64 S.Ct. 1028, 88 L.Ed. 1309 (1944).

The Sales Tax Act imposes an excise tax on the "sale price" of every "sale at retail" of tangible personal property. I.C. § 63–3621. Tangible personal property is defined as "personal property which may be seen, weighed, measured, felt or touched, or which is in any manner perceptible to the senses. The term "tangible personal property" includes any computer software which is not a custom computer program." I.C. § 63–3616(a), (b).

Although the statutory definition of "tangible personal property" does not include services, services are not in all aspects exempt from taxation, as is evidenced by the definition of "sales price":

> **63–3613. Sales price.**—(a) The term "sales price" means the total amount for which tangible personal property, including services agreed to be rendered as a part of the sale, is sold, rented or leased, valued in money whether paid in money or otherwise, without any deduction on account of any of the following:
>
> . . . .
>
> 2. The cost of materials used, labor or service cost, losses, or any other expense.

■ To appropriately apply the use tax statutes to the sale of the subject tariff schedules, three requirements must be fulfilled: First, it must be established that the printed tariff schedules are tangible personal property; second, the tariff schedules must have been obtained through a retail sale; and third, it must be shown that the printed tariffs were under the control and ownership of Consolidated Freightways in Idaho. *Old West Realty, Inc. v. Idaho State Tax Com.,* 110 Idaho 546, 548, 716 P.2d 1318, 1320 (1986).

The first requirement is met in that the tariffs easily fit within the statute's definition of tangible personal property "which may be seen, weighed, measured, felt or

touched, or which is in any other manner perceptible to the senses." The printed tariffs are a physical product. In fact, the record provides a detailed description of the tariff schedule's physical characteristics:

> The printed tariff schedules are published in bound and in loose-leaf form and may be updated as frequently as daily. After receiving the tariff schedules, some of the information is entered into computers, and thereafter Consolidated may not have to refer to the printed, published schedules. Consolidated also acquires computer tapes which contain rate information and uses the tapes to store information for future reference.

The pivotal issue in this controversy is whether the tariff schedules were purchased as part of a retail sale of tangible personal property. The sales tax does not apply to transactions where the rendering of a service is the object of the transaction, even though tangible personal property is exchanged incidentally; but to state that truism does not shed light on the proper resolution of this case.[1] Hence, the issue is further defined as to whether the object of the transaction is a purchase of services or the purchase of tariff schedules. To reach a conclusion as to whether this is a sale of services or a retail sale of tangible personal property, the balancing test established in the Idaho Sales and Use Tax Regulations, Reg. 9, 1.b.i, should be applied.

The test to determine whether the purchase of the tariff schedules was a retail sale is to establish the real object of the transaction. This approach to judicial interpretation of use taxation was used in *Lindner Bros., Inc. v. Kosydar*, 46 Ohio St.2d 162, 346 N.E.2d 690 (1976), where the court viewed the sale of cards and printouts of data processing results as a transfer of tangible property and the real object of the transaction. In *Miami Citizens Natl. Bank & Trust Co. v. Lindley*, 50 Ohio St.2d 249, 364 N.E.2d 25 (1977), the court viewed the providing of printouts of bank transactions as a transfer of tangible property and the real object of the transaction. In *Citizens Financial Corp. v. Kosydar*, 43 Ohio St.2d 148, 331 N.E.2d 435 (1975), the court viewed the providing of printouts of daily banking transactions as the transfer of tangible property and the real object of the transaction. In other

---

1. Here we are dealing with a mixed transaction, that is, one which is in part a sale of both services and tangible personal property, and the regulations provide a method of classifying those mixed transactions consistently with legislative intent:

> b. RETAIL SALES OF TANGIBLE PERSONAL PROPERTY TOGETHER WITH SERVICES:
> i. The sales tax applies to retail sales of tangible personal property. It does not—except to the extent stated above—apply to the sale of services. However, when a sale of tangible personal property includes incidental services, the measure of the tax is the total amount charged including the amount charged for any incidental services, except separately stated transportation and installation charges. The fact that the charge for the tangible personal property sold is principally derived from labor and/or creativity of the maker of the property does not transform a sale of tangible personal property into a sale of services. The cost of any commodity includes labor and skill or manufacture. In determining whether a transaction is a retail sale of tangible personal property or a sale of services, the following tests are to be applied:
> (a) In determining whether a transfer of tangible personal property is a taxable retail sale or a transfer merely incidental to a service transaction, the proper test is to determine whether the transaction involves a consequential or inconsequential professional or personal service. If the service rendered is inconsequential, then the entire transaction is taxable. If a consequential service is rendered, then it must be ascertained whether the transfer of the tangible personal property was an inconsequential element of the transaction. If so, then none of the consideration paid is taxable.
> (b) In determining whether a mixed transaction constitutes a consequential service transaction, a distinction must be made as to the object of the transaction—i.e., is the object sought by the buyer the service per se or the property produced by the service.
> (c) Where a transaction is mixed in such a manner that the tangible personal property transferred and the service rendered are distinct consequential elements having a fixed and ascertainable relationship between the value of the property and the value of the service rendered so that both may be separately stated, there exists two separate transactions and the one attributable to the sale of tangible personal property is subject to sales taxation while the other is not. I.D.A.P.A. 35.02.09,1.b.i.

Ohio State Supreme Court cases, the court held that the transfer of tangible personal property was an inconsequential element of the underlying transaction and that the true object sought was a service.

In *Accountants Computer Services, Inc. v. Kosydar*, 35 Ohio St.2d 120, 298 N.E.2d 519, 523 (1973), the court gave an example of an indicator that the tangible personal property which was transferred was an inconsequential element of the transaction. There, the fact that no separate charge was made for the tangible property obtained was held to be an indication that the transfer was incidental to the service obtained. In the instant case, Consolidated Freightways was charged in a separate account for a variety of services. In another separate account, Consolidated Freightways was charged for the printed tariff schedules. Therefore, the separate charge for the printed tariff schedules is clear evidence that the tangible personal property was not incidental to the service, but was the real object of the transaction.

In *Bullock v. Statistical Tabulating Corp.*, 549 S.W.2d 166, 168 (Tex.1977), the Texas Supreme Court noted that:

> The true object of this transaction is not the data processing *card* as contended by the comptroller, but the purchase of *coded* or *processed data*, an intangible.
>
> The customer brings in raw data which is conceded by both parties to be an intangible item, but perceptible to humans. The customer then buys Plaintiff's capabilities in effecting a translation of the data such that it becomes perceptible to a computer. The essence of the transaction for the customer is an intangible product, coded data and Plaintiff's capabilities in making the translation or coding.

The court recognized that the element of service was the essence of the transaction. In the Bullet case, the customer had the raw data, but needed to have it processed and translated into a computer format. However, in the instant action, the customer did not have the raw data, but was in need of the information. Therefore, in addition to providing the physical printout of the information, the tariff bureau is providing Consolidated Freightways with the sought-after information, which is the real object of the transaction.

In *Columbia Pictures Industries, Inc. v. Tax Comr.*, 176 Conn. 604, 410 A.2d 457, 461 (1979), the court concluded that when consequential services are intertwined with tangible personal property the critical factor determining whether the buyer intended to buy an individual's skills or the tangible end product of those skills is the buyer's end use of the tangible product. In *Columbia*, it was clear that the exhibitor's object was to obtain possession of the salable end product, the film. Therefore, the court concluded that the rental or license to exhibit the motion picture was a taxable sale. Further, since the film was a salable end product, the personal service exemption was held to be inapplicable. The facts of the instant action show similar parallels to the facts presented in *Columbia*. Consolidated exercised control and power over the tariff books. In addition, tariffs and tariff supplements were acquired on many different occasions. It is evident that Consolidated was not interested in just the rate information, but the rate information displayed in a tangible format.

The third and last step in this analysis is whether the use of the tariffs by Consolidated in Boise is subject to use tax. When tangible personal property is purchased outside Idaho for use in Idaho, an excise tax is imposed on its use or consumption in this state. I.C. § 63–3621. It has been established that the tariff schedules are tangible personal property. Further, it is evident that Consolidated Freightways exercised power and control over the tariff schedules incident to their ownership of the tariffs. The tariff schedules were used by Consolidated Freightways in Idaho to further promote their business. Therefore, the use tax is applicable.

■ We next address the issue of the appropriateness of penalty. Consolidated argues that it was not negligent because its failure to pay the contested taxes was based on consultation with its tax accountant, and therefore, no penalty should be

imposed. The record, however, provides no indication as to when the consultation took place, i.e., before or after the tax was due. Therefore, the trial court correctly held Consolidated had not presented evidence sufficient to refute the inference of negligence.

I.C. § 63–3046(a), incorporated into the Sales Tax Act by I.C. § 63–3634, states:

> **63–3046. Additions to the tax in case of deficiency.**—(a) If any part of any deficiency is due to negligence or disregard of rules and regulations but without intent to defraud, five per cent (5%) of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected and paid in the same manner as if it were a deficiency except that no interest shall accrue upon the five per cent (5%) amount hereby imposed.

Courts interpreting statutes similar to I.C. § 63–3046(a) have upheld penalties imposed for deficiencies in sales taxes despite the taxpayer's claim that the deficiency was the result of a good faith controversy as to entitlement to a particular exemption. In *Duval v. Brown*, 31 Conn.Supp. 373, 333 A.2d 63 (1974), the court upheld a penalty imposed upon the taxpayer even though the taxpayer had completely relied upon the advice of a professional accountant.

In *C & D Trailer Sales v. Taxation and Revenue Dept.*, 93 N.M. 697, 604 P.2d 835 (1979), the court held that a taxpayer's mere belief that it was not liable for taxes is tantamount to negligence, and the imposed penalty was appropriate. In *Independent Iron Works, Inc. v. State Board of Equalization*, 167 Cal.App.2d 318, 334 P.2d 236 (1959), the taxpayer argued that a negligence penalty was unjustified because there was an honest dispute over the legality of such a tax. The court, however, did not find that the taxpayer had a reasonable basis for such a belief. Therefore, the court held that the taxpayer knew, or should have known, that the contested transaction was taxable.

In *Robert H. Hinckley, Inc. v. State Tax Com.*, 17 Utah 2d 70, 404 P.2d 662 (1965), the court held that a penalty was discretionary on the part of the tax commission. The court also held that the penalty would be reversed only if evidence were presented that the taxpayer was not negligent. In *Rowe-Genereux, Inc. v. Vermont Dept. of Taxes*, 138 Vt. 130, 411 A.2d 1345 (1980), the court held that penalties imposed by statute on tax deficiencies were purely discretionary and would not be overturned absent abuse of discretion. Here, the record sustains the trial court's finding of negligence and appellant has not demonstrated any abuse of discretion.

■ In addition, of the $49,379 total deficiency, $6,069 was attributable to the tax due on the use of fixed assets other than the tariffs. Consolidated did not dispute the tax on those assets. The statute provides that "if *any part* of any deficiency is due to negligence or disregard," a five per cent penalty attaches to the total amount of the deficiency. Since Consolidated has not attempted to challenge the $6,069 deficiency, the penalty would have been appropriate on the total amount of the deficiency even had there been no negligence as to the $42,310 contested portion of the assessment.

Accordingly, the judgment is affirmed. Costs to respondent, no attorney fees awarded.

DONALDSON and BISTLINE, JJ., concur.

BAKES, Justice, concurring specially:

In this case, Consolidated appealed to the district court from an adverse decision of the tax commission regarding its sales-use tax liability for the tariff schedules more particularly described in the majority opinion. On such an appeal, the statute, I.C. § 63–3812, requires the appeal to be heard *de novo* in the district court. After the initial pleadings were filed, both parties moved for summary judgment in the district court. This Court has held that where both parties move for summary judgment on the same legal issue, and where no jury has been requested, the district court may resolve conflicting inferences from the record and evidence submitted in support

of the motion for summary judgment and may render a decision. *Riverside Development Co. v. Ritchie*, 103 Idaho 515, 650 P.2d 657 (1982); *Old West Realty v. Idaho State Tax Comm'n*, 110 Idaho 546, 716 P.2d 1318 (1986); *Kromrei v. AID Insurance Co.*, 110 Idaho 549, 716 P.2d 1321 (1986); *Jones v. E.G. & G. Idaho, Inc.*, 109 Idaho 400, 707 P.2d 511 (1985).

All of the affidavits in support of the motion for summary judgment were submitted by Consolidated, with none submitted by the state. Nevertheless the same rule applies. The trial court reviewed the entire record and, in a memorandum opinion, made several findings of fact and conclusions of law. The conclusions of law were based upon the sales and use tax regulation 9,1.b.i, which essentially established that the proper test in determining whether a transaction involving both the sale of tangible personal property and a personal service is subject to tax depends upon whether or not the personal service is a consequential or inconsequential element of the transaction. If the service rendered is inconsequential, then the entire transaction is taxable. If the service is consequential and the tangible personal property is inconsequential, then the entire transaction is exempt. If both elements are consequential, then it is mixed, and the tax should be prorated.

Based upon those conclusions of law, the trial court made certain findings in its memorandum decision in which it found that "the services involved are inconsequential to the object of the transaction ...," which object the court found to be the "transfer of tangible personal property." Based upon those findings, the trial court entered judgment for the tax commission.

As previously stated in *K Mart Corp. v. Idaho State Tax Comm'n*, 111 Idaho 719, 723, 727 P.2d 1147, 1151 (1986), "[If] there are sufficient facts from which inferences could be made which support the trial court's decision ... summary judgment should not be disturbed on appeal."

Based upon the entire record before the district court the factual inferences drawn by the district court are sustainable by the record and, accordingly, the judgment of the district court regarding the tax should be sustained on appeal.

SHEPARD, Chief Justice, dissenting.

For several reasons I cannot agree with the majority opinion. The facts are not disputed and are essentially as stated in the majority opinion, with a glaring omission which I feel is crucial to the disposition of this case.

In order to conduct its business, Consolidated acquires tariff schedules from various companies throughout the country. These schedules are mass-produced by tariff bureaus which specialize in compiling and preparing them and providing them to subscribing carriers. These tariff bureaus are non-profit organizations totally subsidized by the subscribing carriers. The printed tariff schedules are published in bound and in looseleaf form and may be updated as frequently as daily. After receiving the tariff schedules, some of the information is entered into computers and, thereafter, Consolidated may not have to refer to the printed published schedules. Consolidated also acquires computer tapes which contain rate information and uses the tapes to store information for future reference.

Various state public service commissions and the Interstate Commerce Act require Consolidated or its statutorily sanctioned agent, a tariff bureau, to provide a copy of the tariff rate schedules to the Interstate Commerce Commission. This is known as the "publishing" requirement. The Act reads: "A motor common carrier shall publish and file with the Commission tariffs containing the rates for transportation it may provide under this subtitle...." 49 U.S.C. § 10762(a)(1).

In its regulations, the ICC has further required either Consolidated or its agent, to provide on request to a shipper or member of the general public a copy of the tariff rate schedules. Consolidated may charge for the schedule, but at a much reduced rate. The ICC stated:

It is conceivable that, because of frivolous demands for copies of tariffs which

would serve no reasonable purpose or be of any benefit to the carriers, the mandatory furnishing of tariffs to persons, whether subscribers or not, at a charge not to exceed the cost of first-class postage, could unduly increase the cost of the publishers. While we hold that the obligation of the carriers to distribute tariffs on a timely, nondiscriminatory basis is fundamental to the tenets of the Interstate Commerce Act, we also recognize that it is important to the economic stability and planning of the carriers that there be a balancing of the resultant cost due to the mutual benefits derived therefrom by both carriers and tariff users. Making some charge, however incidental to the sole purpose, would also tend to limit the requests for tariff matter to those who have a genuine interest in, and need for, such matter, and in so doing, would serve to reduce the financial burden on the carriers. Carriers and agents, after all, should be "fairly entitled to know, with approximate accuracy, the number of extra copies that will be desired."

Balancing the obligations and the benefits accruing, we have modified the rules to require each carrier and each agent to furnish one copy of each publication to the subscriber or other interested person without charge which, in no case, is more than one-half of the demonstrable cost of the paper and the printing or other reproduction process employed which is proportionately assignable to the copy as part of the publication of multiple copies for filing, normal distribution, and stocking. Carrier or publishing agent inhouse cost factors related only to the material and its physical reproduction operation, such as for compiling, overhead, equipment, depreciation, handling, sorting, etc., may not be included in the base for the calculation, but the actual cost of postal service or other authorized means of transmission may be added thereto.

349 ICC at 133–134.

In addition, Consolidated must post at its Boise rate center a written copy of any tariff schedule that it may use in calculating the charge for a particular shipment whether by Consolidated or another carrier ("interlining"). This is the "posting" requirement of the Interstate Commerce Act. Consolidated acquires the tariffs from the tariff bureaus at a cost that is far greater than the cost of their preparation. Thus, Consolidated subsidizes the bureau for the losses incurred in providing tariff rate schedules to shippers for less than cost as required by the Interstate Commerce Commission.

At a trial *de novo* before the district court, Consolidated offered two affidavits from the manager of the tariff bureau in Denver. The affidavits in support of its cross-motion for summary judgment stated that the cost paid by Consolidated for the tariff schedules was far greater than the price charged shippers, thus indicating the service nature of the transaction. The Tax Commission offered nothing in support of its cross-motion for summary judgment.

The first question to address is the propriety of granting the Tax Commission's motion for summary judgment. I.C. § 63–3812 requires that when a taxpayer appeals an adverse decision, the appeal is to be heard in the district court in a trial *de novo*. I.R.C.P. 83(u)(2) requires that on an appeal from a governmental agency or board involving a trial *de novo*, the district court shall render a decision as if the matter were initially brought in the district court. This Court has repeatedly held that summary judgment should be granted only if no genuine issue of material fact is found to exist after the pleadings, depositions, admissions, and affidavits have been construed in a light most favorable to the party opposing the summary judgment. *Farmer's Insurance Co. v. Brown,* 97 Idaho 380, 544 P.2d 1150 (1976); *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.,* 97 Idaho 348, 544 P.2d 306 (1975).

However, on cross-motions for summary judgment, on the same evidentiary facts and on the same theories and issues, the parties effectively stipulate that there is no genuine issue of material fact. Where the evidentiary facts are not disputed and the trial court will be the trier of fact, summa-

ry judgment is appropriate despite the possibility of conflicting inferences, because the court·alone will be responsible for resolving the conflict between those inferences. *Riverside Development Co. v. Ritchie,* 103 Idaho 515, 650 P.2d 657 (1982). Justice Bakes recently noted in a dissent that "[If] there are sufficient facts from which inferences could be made which support the trial court's decision, ... summary judgment should not be disturbed on appeal." *K Mart Corporation v. Idaho State Tax ·Commission,* 111 Idaho 719, 727 P.2d 1147 (1986) (Bakes, J., dissenting). *See also Argyle v. Slemaker,* 107 Idaho 668, 691 P.2d 1283 (Ct.App.1984).

In this case the only evidence before the district court was two affidavits in support of Consolidated's petition and a tariff rate schedule. The Tax Commission presented no evidence at trial. The Tax Commission's decisions are entitled to a presumption of correctness. *County of Ada v. Red Steer Drive Ins of Nevada, Inc.,* 101 Idaho 94, 609 P.2d 161 (1980); *Merris v. Ada County,* 100 Idaho 59, 593 P.2d 394 (1979). However, this presumption disappears as soon as the taxpayer introduces evidence sufficient to make out a prima facie case. Consolidated offered affidavits in support of its position. Absent the presumption, the district court had nothing in evidence from which inferences could be drawn to support summary judgment. Therefore, summary judgment was improper.

Next, I address the question of whether the use tax under I.C. § 63–3621 is applicable to Consolidated's acquisition of the tariff rate schedules. The use tax states in pertinent part:

**Imposition and rate of the use tax.**—An excise tax is hereby imposed on the storage, use, or other consumption in this state of tangible personal property acquired on or after July 1, 1965 for the storage, use, or other consumption in this state at the rate of four per cent (4%) of the value of the property, and a recent sales price shall be presumptive evidence of the value of the property.[1]

The terms "use" and "storage" are defined in I.C. § 63–3615(a) and (b):

**Storage—Use.**—(a) The term "storage" includes any keeping or retention in this state for any purpose except sale in the regular course of business or subsequent use solely outside this state of tangible personal property purchased from a retailer.

(b) The term "use" includes the exercise of any right or power over tangible personal property incident to the ownership or the leasing of that property ..., except the term "use" does not include the sale of that property in the regular course of business....

I.C. § 63–3609, which was in effect during the period in question, in pertinent part defines a retail sale as follows:

**Retail sale—Sale at retail.**—The terms "retail sale" or "sale at retail" means a sale of tangible personal property for any purpose other than resale of that property in the regular course of business or lease or rental of that property in the regular course of business where such rental or lease is taxable under section 63–3612(h) of this act.

The sales tax does not apply to transactions where the rendering of a service is the object of the transaction, even though tangible personal property is exchanged incidentally. The sales and use taxes are complimentary so that if a transaction is not subject to a sales tax it is not subject to the use tax. *Quotron Systems v. Comptroller of the Treasury,* 287 Md. 178, 411 A.2d 439 (Md.1980). To determine whether the object of a transaction is a sale of services or a retail sale requires a balancing test as set forth in the Idaho Sales and Use Tax Regulation and Idaho Sales Tax Act, Regulation 9,1.b.i (I.D.A.P.A. 35.-02.09,1.b.i.).

b. RETAIL SALES OF TANGIBLE PERSONAL PROPERTY TOGETHER WITH SERVICES:

i. The sales tax applies to retail sales of tangible personal property. It does not—except to the extent stated above—apply to the sale of services. However,

**1.** During the time period in question the rate was 3%.

when a sale of tangible personal property includes incidental services, the measure of the tax is the total amount charged including the amount charged for any incidental services, except separately stated transportation and installation charges. The fact that the charge for the tangible personal property sold is principally derived from labor and/or creativity of the maker of the property does not transform a sale of tangible personal property into a sale of services. The cost of any commodity includes labor and skill of manufacture. In determining whether a transaction is a retail sale of tangible personal property or a sale of services, the following tests are to be applied:

(a) In determining whether a transfer of tangible personal property is a taxable retail sale or a transfer merely incidental to a service transaction, the proper test is to determine whether the transaction involves a consequential or inconsequential professional or personal service. If the service rendered is inconsequential, then the entire transaction is taxable. If a consequential service is rendered, then it must be ascertained whether the transfer of the tangible personal property was an inconsequential element of the transaction. If so, then none of the consideration paid is taxable.

(b) In determining whether a mixed transaction constitutes a consequential service transaction, a distinction must be made as to the object of the transaction —i.e., is the object sought by the buyer the service per se or the property produced by the service.

(c) Where a transaction is mixed in such a manner that the tangible personal property transferred and the service rendered are distinct consequential elements having a fixed and ascertainable relationship between the value of the property and the value of the service rendered so that both may be separately stated, there exists two separate transactions and the one attributable to the sale of tangible personal property is subject to sales taxation while the other is not.

The majority, in describing its proper test, sets out on page four, three requirements:

[F]irst, it must be established that the printed tariff schedules are tangible personal property; second, the tariff schedules must have been obtained through a retail sale; and third, it must be shown that the printed tariffs were under the control and ownership of Consolidated Freightways in Idaho. (Citations omitted).

No one disputes that the tariff schedules are tangible personal property and that they were under Consolidated's control. The majority's second requirement, however, requires a retail sale. The majority then conveniently cites cases from other jurisdictions supporting its position, ignoring the fact that Idaho has a statutory definition of retail sale. I submit that Consolidated's use of the tariff schedules occurs in the regular course of business and is subject to neither the use tax nor the sales tax. This position is supported by the crucial fact that Consolidated is required by federal law to sell the tariff schedules at a loss to anyone who wants one. I can think of no clearer example of a sale in the regular course of business.

Further, in this case there is a strong inference of a service transaction. The affidavits offered by Consolidated show that anyone could purchase the tariffs for a fraction of the price that Consolidated could. To apply the test outlined in Regulation 9,1 above, much more information is needed. How much of the cost to Consolidated was for the volumes themselves? How much was cost for acquisition, and how much consisted of dues paid to belong to the organization of shippers that form the tariff bureaus? What other benefits or services did Consolidated receive for its money? These questions need answers to determine the object of the transaction.

Recently, in *Old West Realty, Inc. v. Idaho State Tax Commission*, 110 Idaho 546, 716 P.2d 1318 (1986), the Court dealt with a similar case but involving the sales tax. Since sales and use taxes are complimentary, much of the reasoning is applica-

ble here. In *Old West Realty, supra,* the dispute centered on weekly or by-weekly multiple listing booklets (MLS books) used by real estate salesmen. Old West was a member of Ada County Multiple Listing Service (Ada MLS). Old West received, for its monthly fee, a number of MLS books as well as other services. These books listed all properties for sale in Ada County with pictures and other information. In the contract for the service, Ada MLS required that the books remain confidential and that the books could not be shown to any non-member. The Tax Commission held that (1) the books were tangible personal property, and (2) any incidental services provided along with the transfer were inconsequential. Old West appealed to this Court claiming the MLS books transfer was incidental to the services provided by Ada MLS.

This Court stated that:

[F]or the Tax Commission to prevail in this case, it must be clear from the facts that (1) the MLS books constitute tangible personal property, (2) the transfer involving the transfer of the books from Ada MLS to Old West constitutes a "sale" of tangible personal property "at retail," and (3) the "sales price" is the entire amount of the monthly fee. *Old West Realty,* 110 Idaho 546 at 548, 716 P.2d 1318 at 1320.

The Court then held that the MLS books were tangible personal property, that there was a "sale at retail" since Old West had no intention of reselling the books and, in fact, was prohibited from doing so by the bylaws of the Ada MLS, and that the entire monthly fee was the "sales price" because Old West failed to allege or separate from the monthly fee those amounts properly attributable to the monthly fees.

The instant case can be distinguished on two grounds. First, as stated above, where Old West was prohibited from distributing copies of the MLS books, Consolidated is required by the ICC to resell the tariff rate schedules. Clearly, Consolidated resells the schedules in the regular course of business. If so, Consolidated would not be subject to the use tax.

Second, a genuine question exists as to whether Consolidated provided the schedules incidental to a service. How much of the fee is paid for services in addition to the actual costs of the printed tariffs? How much consisted of dues to belong to the organization of shippers that form the tariff bureaus? What other benefits or services did Consolidated receive? Unlike in *Old West Realty, supra,* Consolidated appears to have paid far more for the tariff schedules than their actual worth, giving the implication that the transaction was a service.

Finally, I turn to Consolidated's claim that the penalty for negligence assessed against Consolidated pursuant to I.C. § 63–3046(a) violates due process and is unconstitutional. Consolidated claims that of the $49,379.00 penalty assessed by the Tax Commission, and later affirmed by the district court, only $6,069.00 of that amount relates to assets other than the tariff schedules. Consolidated offered a substantial legal argument in support of its position. They further assert that to hold Consolidated liable for the entire penalty without proof of negligence results in the imposition of strict liability, thereby violating due process. The penalty was assessed on the entire deficiency of $49,379.00 when only a deficiency of $6,069.00 is arguably due to negligence under the statute. This Court has repeatedly held that it will not pass upon the validity of a statute unless essential to the disposition of the case. *Erickson v. Amoth,* 99 Idaho 907, 591 P.2d 1074 (1978); *Curtis v. Child,* 95 Idaho 63, 501 P.2d 1374 (1972). We need not decide this question at the present time.

I submit that the granting of summary judgment was improper. The decision of the district court granting summary judgment should be reversed and remanded for proceedings not inconsistent with this opinion.